**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **MICHAEL DELEON AND** ) <br> **DESIREE DELEON individually,** ) <br> **And as representative of the** ) <br> **ESTATE OF SULEMA DELEON** ) <br>     *Plaintiffs* ) <br> ) <br> **v.** ) <br> ) <br> **TRINITY HEALTH CENTER AND** ) <br> **CARADAY HEALTHCARE LLC** ) <br>     *Defendants* ) | **Case No. 1:20-cv-00945** |

**DEFENDANTS' NOTICE OF REMOVAL**

    Defendants Trinity Care Center (incorrectly named in the style as "Trinity Health Center") ("Trinity") and CaraDay Healthcare, LLC ("Caraday") (collectively referred to herein as "Defendants"), by and through their attorneys, hereby remove this action from the District Court, Travis County, Texas to the United States District Court for the Western District of Texas, Austin Division, pursuant to 28 U.S.C. §1441 and 1446, reserving all defenses and objections to venue. The grounds from removal are based on 28 U.S.C. § 1331, 42 U.S.C. § 247d-6d(e)(1), and 28 U.S.C. § 1442(a)(1) as follows:

    **I.    COMPLIANCE WITH PROCEDURAL REQUIREMENTS**

    1.    Plaintiffs Michael Deleon and Desiree Deleon ("Plaintiffs") commenced the above-captioned action in the District Court, Travis County, Texas, on July 30, 2020, Case No. D-1-GN-20-003961 ("State Court Action"). A true and correct copy of Plaintiffs' Original Petition is attached hereto as *Exhibit A*.

2. A notice of removal must be filed within 30 days after receipt by the defendant of the initial pleading setting forth the claim for relief upon which the action is based. 28 U.S.C. §1446(b). The thirty (30) day period for removal does not begin to run until the defendant has received a copy of the complaint and has been properly served. *Murphy Brothers, Inc. and Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-348 (1999).

3. Defendant Trinity was served with the Summons and Original Petition on August 20, 2020. Defendant CaraDay was served with the Summons and Original Petition on September 9, 2020. Therefore, this Notice of Removal is timely filed under 28 U.S.C. §1446(b).

4. All fees required by law in connection with this notice have been filed by Defendants.

5. This notice is filed on behalf of all named Defendants, and thus all Defendants expressly consent to this Notice of Removal as required by U.S.C. § 1446(b)(2).[1]

6. This matter is removable to this Court as the federal district for the place where the state court action is pending. 28 U.S.C. § 1441(a).

7. Pursuant to 28 U.S.C. § 1446(a), a copy of the state court docket sheet, all process, pleadings, orders, and records served upon Defendants in the State Court Action are attached as *Exhibits A – E*. Specifically, attached hereto are true and accurate copies of (A) Plaintiffs' Original Petition for Damages (including discovery attached), (B) Citation to Trinity Care Center, (C) Citation to CaraDay Healthcare, LLC, (D) Affidavit of Service for Trinity Care Center, and (E) State Court Docket Sheet.

8. Written notice of the filing of this Notice of Removal will be given to Plaintiffs.

---

[1] All Defendants are represented by the undersigned counsel.

9. A copy of this Notice of Removal will be filed concurrently herewith in the District Court, Travis County, State of Texas as required by 28 U.S.C. § 1446(b). No hearing has been set in the State Court Action as of the time of filing of this Notice of Removal.

10. By filing this Notice of Removal, Defendants do not waive any defenses which may be available to Defendants.

## II.   GROUNDS FOR REMOVAL

**A.   This Court Has Original Jurisdiction Under 28 U.S.C. § 1331 (Federal Question) Because Plaintiffs' Claims Arise Under The Federal Public Readiness and Emergency Preparedness Act.**

11. Plaintiffs filed this medical-negligence action in both their individual capacities and their capacities as representatives of Sulema Deleon's estate. *Exhibit A*. Plaintiffs' claims arise from allegations that Defendants failed to follow specialized COVID-19 precautions and protocols, which led to Sulema contracting COVID-19 at Defendants' nursing facility and subsequently passing away as a result. *Exhibit A* at ¶¶ 14-33, 36, 40.

12. The Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d, 247d-6e (2006), through the Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020), amended by 85 Fed. Reg. 21012 (Apr. 15, 2020) (collectively, the "PREP Act") are federal statutes that apply specifically to Defendants in the administration of countermeasures to prevent or mitigate the spread of COVID-19. More specifically, the PREP Act provides immunity from, and expressly preempts, all state law tort claims against "covered persons" for any claim for loss caused by, arising out of, relating to, or resulting from, the administration to or use by an individual of a covered countermeasure following a declaration by the Secretary of Health and Human Services identifying a health condition as a public health emergency under the PREP Act. As most relevant to this case, the Secretary issued declarations

under the PREP Act, which became effective on February 4, 2020, to extend the PREP Act's protections and immunity to COVID-19 countermeasures, including testing and certain personal protective equipment such as masks and other respiratory protective devices.

13. The PREP Act expressly preempts Plaintiffs' state-law tort claims for purposes of federal question jurisdiction. 42 U.S.C. § 247d-6d(b)(8). As established by the PREP Act, Plaintiffs' exclusive remedy for the claims brought in the State Court Action is instead through a separate patient injury fund to be administered by the U.S. Department of Health and Human Services. § 247d-6d(b)(8).

14. The issue of whether federal question jurisdiction exists when a complaint asserts a cause of action under state law is addressed in *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1 (2003). There, the Court explained:

> [A] state claim may be removed to federal court … when a federal statute wholly displaces the state-law cause of action through complete preemption. When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law. In the two categories of cases where this Court has found complete pre-emption . . . the federal statutes at issue provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action.

*Id.* at 8.

15. In *Anderson*, the plaintiff brought an action for usury under state law, which was preempted by the usury provisions of the National Bank Act, 12 U.S.C.A. §§ 85 and 86. The Court held that the usury provisions under §§ 85 and 86 collectively "supersede both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive." *Anderson*, 539 U.S. at 11. Thus, the court held in turn that federal question removal was proper under the "complete preemption" doctrine. *See also Metro. Life Ins. Co. v. Taylor*, 481

U.S. 58 (1987) (holding that purely state law claims may be removed to federal court when a federal statute clearly intends for the action to be resolved under federal law).

16. Following Anderson, U.S. Circuit Courts and District Courts have subsequently found "complete preemption" where a federal statute expressly preempts state law and creates an exclusive federal remedy for the preempted state claims. *See, e.g.*, *In re WTC Disaster Site*, 414 F.3d 352, 380 (2d Cir. 2005); *Spear Marketing, Inc. v. Bancorp South Bank*, 791 F.3d 586 (5th Cir. 2015); *Keller v. Bank of America, N.A.*, 228 F. Supp. 2d 1247 (D. Kan. 2017); *Nott v. Aetna U.S. Healthcare, Inc.*, 303 F.Supp.2d 565 (E.D.Pa. 2004).

17. As detailed below, Plaintiffs' lawsuit falls squarely within the PREP Act's purview and is therefore completely preempted under 42 U.S.C. § 247d-6d(b)(8). This Court consequently has original jurisdiction pursuant to 28 U.S.C. § 1331, and the case is therefore properly removable under 28 U.S.C. § 1441(a).

   *i.    Defendants are "covered persons" under the PREP Act.*

18. A "covered person" under 42 U.S.C. § 247d–6d includes, among others, a "person or entity that is . . . a program planner of such [COVID-19] countermeasure; a qualified person who prescribed, administered, or dispensed such [COVID-19] countermeasure; or an official, agent, or employee of [such] entity." § 247d–6d(i)(2)(B)(iii)-(v). The term "program planner" means

> "a person . . . who supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with [the Secretary's declaration].

*Id.* at § 247d–6d(i)(6). "[A] private sector employer . . . can be a program planner when it carries out the described activities." 85 Fed. Rg. At 15202. A "qualified person" is defined as a "licensed health professional or other individual who is authorized to prescribe, administer, or dispense such

5

countermeasures under the law of the State in which the countermeasure was prescribed, administered, or dispensed." § 247d–6d(i)(8)(A). The PREP Act further defines a "person" as "an individual, partnership, corporation, association, entity, or public or private corporation, including a federal, state or local government agency or department." § 247d–6d(i)(5).

19.  In this case, Defendants qualify as "covered persons" because Defendants are both a "qualified person" and "program planner" under 42 U.S.C.A. § 247d-6d(i)(2)(B). As it relates to the former, Trinity is licensed by the State of Texas as a skilled nursing and rehabilitation facility, and it employs licensed nursing personnel for the purpose of developing and implementing policies, procedures, and other countermeasures to prevent, limit, and/or control the spread of COVID-19. *See* 42 U.S.C. § 247d-6d(i)(8); 85 Fed. Reg. 15198, 15202-03 (March 17, 2020). Further, Trinity's staff members include Registered Nurses and Licensed Practical Nurses licensed in the State of Texas who are licensed and authorized to administer FDA-approved COVID-19 devises, tests, and medications used to treat the same. § 247d–6d(i)(2)(B)(iv)-(v); § 247d–6d(i)(8); 85 Fed. Reg. 15198, 15202-03.

20.  Trinity and CaraDay also meet the requirements of a "program planner" of countermeasures under the PREP Act, in that they each supervised or administered the facility's infection control and COVID-19 specific programs that, as of March 9, 2020, began to administer, provid or dispense covered countermeasures in the treatment of COVID-19 patients, including but not limited to, the use of facemasks and other personal protective equipment, facility-wide COVID-19 testing, visitation restrictions, and screening requirements in an effort to diagnose, mitigate, treat, and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom. As such, both Defendants are "covered persons" as defined in the PREP Act and the authorizing Declaration by the HHS Secretary.

### ii. *Plaintiffs' claims arise out of, relate to, or result from the administration and/or use of a "covered countermeasure."*

21. On its face, Plaintiffs' Original Petition includes claims and allegations hinging on the measures taken by Defendants to prevent or mitigate the spread of COVID-19, including Defendant's administration to or use by an individual of a covered countermeasure, which were administered after February 4, 2020, for purposes of treating, mitigating or diagnosing COVID-19 and/or the SARS-CoV-2 coronavirus, and therefore, presents a Federal Question under the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. § 247d-6d(d).

22. More specifically, Defendants' staff implemented certain countermeasures in relation to COVID-19, including but not limited to, the use of facemasks and other personal protective equipment, facility-wide testing, visitation and access restrictions, and screening requirements. Facemasks used to prevent or mitigate the spread of COVID-19 are qualified pandemic or epidemic products, as defined by 42 U.S.C.A. § 247d-6d(i)(7), as a device used, designed, and developed to mitigate or prevent the spread of COVID-19 and was authorized for emergency use in accordance with section 564, 564A, or 564B of the Federal Food, Drug, and Cosmetic Act.

23. In turn, Plaintiffs are suing Defendants for injuries Plaintiffs claim were caused by or relate to the administration or use of facemasks and other personal protective equipment, testing of residents and employees, isolation of residents, and visitation and access restrictions. *Exhibit A* at ¶¶ 22-23, 27, 36, 39-40. Thus, Plaintiffs' claim for loss specifically "arises out of, relates to, or results from" the administration and/or use of such "covered countermeasure," or reasonably believed so by Defendants, for the purpose of treating, diagnosing, curing, preventing, or mitigating COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, as such terms are defined by the PREP Act. 42 U.S.C. § 247d-6d, via the Declaration Under the Public

Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020), amended by 85 Fed. Reg. 21012 (Apr. 15, 2020), and all corresponding amendments, regulations, and interpretational case law.

**B.     Jurisdiction Is Proper On The Basis Of Federal Officer Removal Under 28 U.S.C. § 1442(a)(1).**

24.     28 U.S.C. § 1442(a)(1) provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. "Unlike the general removal statute, the federal officer removal statute [Section 1442(a)] is to be 'broadly construed' in favor of a federal forum." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) (quoting *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994).

25.     The case is removable pursuant to § 1442(a) because "(1) Defendants are 'persons' within the meaning of the statute; (2) Plaintiffs' claims are based upon Defendants' conduct 'acting under' the United States, its agencies, or its officers; (3) Plaintiffs' claims are 'for, or relating to' an act under color of federal office; and (4) Defendants raise a colorable federal defense to the Plaintiffs' claims." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016). All requirements for removal under § 1442(a)(1) are therefore satisfied here.

   *i.     Defendants are all "persons" under the federal officer removal statute.*

26.     Trinity and Caraday are corporate entities. And corporations are "person[s]" pursuant to § 1442(a)(1). *Papp*, 842 F.3d at 812 (holding that for purposes of § 1442(a), "a corporation is in legal fact a person.") (citing 1 U.S.C. § 1).

   *ii.    Plaintiffs' claims are based upon Defendants' conduct 'acting under' the United States, its agencies, or its officers.*

27.     The "acting under" requirement, like the federal removal statute overall, is to be "liberally construe[d]" to cover actions that involve "an effort to assist, or to help carry out, the

8

federal supervisor's duties or tasks." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007)); *see also Defender Ass'n*, 790 F.3d 457, 468 (2015).  To satisfy the "acting under" requirement, "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Watson*, 551 U.S. at 152.  Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

28. Instead, a specific instruction from a federal officer, or a detailed regulation to compel specific conduct satisfies the second requirement.  *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d. 387 (5th Cir. 1998).  "The hurdle erected by this requirement is quite low." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008).  Defendants must simply "demonstrate that the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government." *Id.*  In determining whether a causal connection exists, the Court is to give credit to Defendants' theory of the case. *Id.*

29. The following are an exemplary, but are no way a complete list of some of the detailed directives and regulations issued by Centers for Medicare and Medicaid Services ("CMS") and the Centers for Disease Control ("CDC") to specifically compel healthcare providers and nursing homes like Defendants to assist in the national effort to respond to the COVID-19 pandemic.

30. First, as early as February 6, 2020, CMS took direct action to prepare healthcare facilities for a national response to what would be become the COVID-19 pandemic.[2]  Second,

---

[2] Centers for Medicare & Medicaid Services, Press Release "CMS Prepares Nation's Healthcare Facilities for Coronavirus Threat" (February 6, 2020) (available at https://www.cms.gov/newsroom/press-releases/cms prepares-nations-healthcare-facilities-coronavirus-threat).

9

as early as February 1, 2020, the CDC was providing superseding guidance to state and local health departments and healthcare facilities including detailed recommendations for patient screening for the COVID-19 virus.  In issuing such guidance, the CDC noted that current knowledge of the nature of the virus was evolving, and that these efforts were part of an "ongoing US public health response to identify and contain this outbreak and prevent sustained spread of 2019-nCov in the United States."[3]  Third, on or about March 4, 2020, CMS announced several additional actions aimed at limiting the spread of the COVID-19 virus, including requiring healthcare facilities to maintain specific infection control and prevention policies as a condition for participation in CMS programs.[4]  Additionally, CMS guidance on this date called for healthcare facilities to work at the direction and coordination of the CDC and local public health departments.  Finally, CMS guidance on this date addressed the screening of entrants into nursing facilities.

31.     On March 10, 2020, CMS published a memorandum clarifying and amending policies and guidance in light of the CDC's expansion of the types of facemasks healthcare workers may use in situations involving COVID-19.[5]  In doing so, CMS acknowledged the federal government was taking "critical steps" to prepare health care facilities to respond to COVID-19, and acknowledged the need to "explore flexibilities and innovative approaches within our regulations to allow health care entities to meet the critical health needs of the country."  The memorandum issued on this date cites specifically to updated guidance from the CDC regarding addressing the supply, allocation, and use of various items utilized to prevent

---

[3] Centers for Disease Control and Prevention, Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (February 1, 2020) (available at https://emergency.cdc.gov/han/HAN00427.asp).

[4] Centers for Medicare & Medicaid Services, Guidance for Infection Control and Prevention Concerning Coronavirus (COVID-19): FAQ's and Considerations for Patient Triage, Placement and Hospital Discharge (March 4, 2020) (available at https://www.cms.gov/files/document/qso-20-13-hospitalspdf.pdf-2).

[5] Centers for Medicare & Medicaid Services, Guidance for use of Certain Industrial Respirators by Health Care Peronnel (March 10, 2020) (available at https://www.cms.gov/files/document/qso-20-17-all.pdf).

the spread of infection and directly treat the virus including PPE and respirators, and further provided guidance on the use of airborne infection isolation rooms (AIIR).

32. On this same date, the Secretary of Health and Human Services (HHS) issued notice pursuant to section 564 of the Federal Food, Drug, and Cosmetic (FD&C) Act that there is a public health emergency that has a significant potential to affect national security or the health and security of United States, and in doing so, declared justifying the authorization of emergency use of personal respiratory protective devices during the COVID-19 outbreak, pursuant to § 564 of the FD&C Act, subject to the terms of any authorization issued under that section.[6]

33. Three days later, on March 13, 2020, CMS published <u>revised</u> directives, specifically aimed at nursing homes, to "improve infection control and prevention practice to prevent the transmission of COVID-19."[7]  In updating its directives, CMS ordered facilities to restrict visitors, cancel communal activities, screen staff, amend policies regarding interaction with vendors, and handle potential end-of-life interactions with family members, among other interventions.  CMS also provided guidance regarding patient transfers and accepting patients with COVID-10. Critically, CMS memorandum on this date acknowledged scarcity of PPE such as gowns, N95 respirators, surgical masks and ABHR, and noted it would not cite facilities for lack of supplies for reasons outside of their control.  Again, CMS directed infection control efforts and clarified CDC guidance to preserve scarce medical resources including PPE and maximize the capacity of the healthcare system to mitigate the spread of the pandemic. On this date, President Donald J. Trump issued a "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus

---

[6] Department of Health and Human Services, Office of the Secretary, Emergency Use Declaration, Federal Register/ Vol. 85, No. 47 (March 10, 2020) (available at https://www.govinfo.gov/content/pkg/FR-2020-03-10/pdf/2020-04823.pdf).

[7] Centers for Medicare & Medicaid Services, Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised) (March 13, 2020) (available at https://www.cms.gov/files/document/qso-20-14-nh-revised.pdf).

Disease (COVID-19) Outbreak. Following same, rapid action was taken to waive restrictions and expand capacity for healthcare entities, providers, and suppliers to coordinate a national response to the national emergency.

34. On April 2, 2020, CMS issued <u>new</u> guidelines aimed specifically to long-term care facilities to mitigate the spread of COVID-19, with the stated purpose of 'critical, needed leadership" and issuing "immediate" actions to "keep patients and residents safe."[8] Specifically, CMS directed long-term care facilities to "immediately" ensure compliance with "all CMC and CDC guidance related to infection control." Again, CMS specifically referenced and referred facilities to updated and revised CDC guidelines. CMS also implemented a number of actions to be undertaken immediately including 1) universal screening; 2) conservation of PPE; 3) proper PPE use; and 4) allocation of separate staffing, among other directives. On April 19, 2020, CMS announced new regulatory requirements requiring nursing facilities to inform residents, families, and representatives of COVID-19 cases.[9]

35. Defendants followed these directives in an effort to assist, or to help carry out, the duties or tasks of CMS and the CDC in responding to the COVID-19 pandemic. At all relevant times, Defendants, in their preparation and response to the COVID-19 outbreak, were acting hand-in-hand with, and at the specific instruction and oversight of the federal government—specifically the Department of Health and Human Services, the Centers for Medicare and Medicaid Services, and the Center for Disease Control and Prevention—in responding to the federal government's interventions, efforts, and mandates, to address the on-going national state

---

[8] Centers for Medicare & Medicaid Services, COVID-19 Long-Term Care Facility Guidance (April 2, 2020) (available at https://www.cms.gov/files/document/4220-covid-19-long-term-care-facility-guidance.pdf).

[9] Centers for Medicare & Medicaid Services, Press Release "Trump Administration Announces New Nursing Homes COVID-19 Transparency Effort" (April 19, 2020) (available at https://www.cms.gov/newsroom/press-releases/trump-administration-announces-new-nursing-homes-covid-19-transparency-effort).

of emergency and achieve a task that furthered the federal government's end-goal in response to the pandemic. Defendants actions were taken "in an effort to assist, or to help carry out, the duties or tasks" dictated by the CDC and CMS in responding to the COVID-19 pandemic. Defendants' actions and conduct were taken due to unprecedented and "strong government intervention" which went beyond the "mere auspices of federal direction." *See Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N. D. Cal. 1992). Defendants' were acting specifically at the direction and under the supervision of the United State government with respect to various countermeasures implemented to prevent and treat the COVID-19 virus including following evolving and specific guidelines from CMS and the CDC with respect to: 1) infection control policies and procedures; 2) PPE procurement; 3) PPE allocation; 4)admission and discharge of residents; 5) managing visitors and outside persons 6) staffing allocation and retention; 7) isolation protocols and management, among multiple additional directives.

36. In short, Defendants' response to the COVID-19 outbreak as it relates to Plaintiffs claims was directly related to <u>what they were asked to do</u> by the federal government.

### iii. *Plaintiffs' claims are 'for, or relating to' an act under color of federal office.*

37. This element is often referred to as the "nexus" or "causation" requirement, and requires that the alleged conduct have been undertaken "for or relating to" a federal office. To meet this requirement, "it is sufficient for there to be a connection or association between the act in question and the federal office." *Defender Ass'n*, 790 F.3d at 471.

38. There is a clear causal nexus between the claims against Defendants and the actions taken by Defendants in responding to and administering care related to the COVID-19 outbreak. Plaintiffs' Original Petition specifically references the CDC's and CMS's issuance of guidelines and regulations governing Defendants' operation in the face of COVID-19, including

but not limited to testing of patients and residents, isolation of patients, use of personal protective equipment, and sanitization measures. *Exhibit A* at ¶¶ 19-22. In turn, Plaintiffs allege Defendants failed to follow those guidelines and regulations. *Id.* at ¶¶ 23, 36, 39-40. Unquestionably, the nexus element is met as evidence by various orders, guidelines and recommendations followed by the Defendants' in addressing same.

### *iv.   Defendants raise a colorable federal defense to the Plaintiffs' claims.*

39.   For the purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statute is to secure that the validity of the defense may be tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Defendants meet this final requirement because, as explained above, they have raised the defense of immunity under the PREP Act. In short, Defendants each meet the requirements of a "covered person" as defined by 42 U.S.C. § 247d–6d, and their actions underlying Plaintiffs' claims constitute "covered countermeasures" pursuant to the PREP Act. As a result, Defendants are immune from liability for purposes of the present suit.

### III.   CONCLUSION

40.   Through the PREP Act, Congress manifested its intent to preempt state law with respect to claims that invoke or involve PREP Act immunity and to create an exclusive federal remedy for such preempted claims. Plaintiffs' claims clearly fall within that category, and are thus completely preempted for purposes of federal question jurisdiction and are removable under 28 U.S.C. § 1441(a). Separately, Plaintiffs' claims are removable under § 1442(a)(1) because they arise out of the actions Defendants undertook at the direction of the federal government. The Court should therefore exercise jurisdiction over this case.

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**

/s/  Lori D. Proctor
Lori D. Proctor
State Bar No. 16682400
909 Fannin Street, Suite 3300
Houston, Texas. 77010
Telephone: 713.353.2000
Facsimile: 713.785.7780
Lori.Proctor@wilsonelser.com
Counsel for Defendants

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 14, 2020, a true and correct copy of the foregoing Notice of Removal was filed with the Court via ECF and served to all parties of record as follows:

Jacqueline A. Stump
Tej R. Paranjpe
Paranjpe Mahadass Ruemke LLP
3701 Kirby, Suite 530
Houston, TX 77098
832.667.7700
*Counsel for Plaintiffs*

/s/ Lori D. Proctor
Lori D. Proctor